**Shelby COLLINS, Plaintiff,**

v.

**UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950 et al., Defendants.**

**Civ. A. No. 1877-67.**

United States District Court
District of Columbia.

April 22, 1969.

---

4. This figure represents the plaintiffs' estimate of the anticipated attendance at the rally.

Joseph H. Newlin, Washington, D. C., for plaintiff.

Charles L. Widman, Washington, D. C., for defendants.

## OPINION

HOLTZOFF, District Judge.

This case relates to the Welfare and Retirement Fund established by the United Mine Workers of America, a labor union representing coal miners. Two questions are presented. The first is whether the courts have power to set aside as arbitrary and capricious, a regulation adopted by the trustees of the fund, prescribing eligibility for applicants for benefits. The second is whether a particular regulation, which is being questioned in this case, should be set aside as arbitrary and capricious.

This action is brought by a retired coal miner against the trustees of the Fund to recover a retirement pension that he claims is due him. The salient facts are not in dispute. The Welfare Fund for the purpose of paying retirement pensions and other benefits to coal miners, was created by an agreement between the United Mine Workers of America and a group of owners and operators of coal mines. The Fund is made up of contributions made by the latter. Each operator periodically pays into the Fund a specified amount based on the quantity of coal produced by his mine. The Fund originated in 1946. The creation of such funds was recognized and sanctioned by Congress in the Labor Management Relations Act, 1947 (Taft-Hartley Act), 29 U.S.Code § 186(c) (5).

A new agreement executed in 1950 between the Union and the operators is now in existence, with some amendments adopted from time to time, that are not germane to this action. This agreement established a Fund designated as "The United Mine Workers of America Welfare and Retirement Fund of 1950". The Fund consists of contributions made by each coal mine operator signatory to the agreement, amounting to thirty cents on each ton of coal produced by his mine.

It is administered by a Board of Trustees. It is an irrevocable trust. The purposes of the Fund are to make payments of benefits to employees of mine operators, their families and dependents, for medical or hospital care, pensions on retirement or death of employee, and benefits of other types specified in the agreement that are not relevant to this action. Subject to the stated purposes of the Fund, the trustees are given full authority to determine questions of coverage and eligibility to receive benefits and all other related matters. A portion of the Fund was to be set aside for pensions or annuities for retired members of the Union, their families or dependents.

The trustees in due course adopted and promulgated regulations prescribing qualifications for eligibility to receive a pension. The existing regulations involved in this case, were issued by the trustees on January 4, 1965, and are contained in what is known as Resolution No. 63. The requirements for a pension are as follows:

I. *Eligibility.*

A. An applicant who subsequent to February 1, 1965, permanently ceases work in the bituminous coal industry as an employee of an employer signatory to the National Bituminous Coal Wage Agreement of 1950, as amended, shall be eligible for a pension if he has:

1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

2. Completed twenty (20) years' service in the coal industry in the United States * * *

3. Permanently ceased work in the coal industry immediately following regular employment for a period of at least one (1) full year as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement, as defined in paragraphs II B hereof.

In other words, in order to be eligible to receive a pension, a coal miner who retired subsequently to February 1, 1965, must have been at least fifty-five (55) years of age; have completed twenty (20) years' service in the coal industry; and during one (1) full year immediately preceding his retirement, must have been employed by an employer signatory to the agreement, in other words by a mine operator who made contributions to the Fund.

The plaintiff, who is a retired coal miner, applied to the trustees for a pension. He was found eligible under paragraphs 1 and 2 of the requirements, but not in compliance in respect to the third requirement, in that during the year preceding his retirement he was employed in a non-union mine instead of by an employer signatory to the agreement. It was found that the mine in which he was employed during his last year of service was a non-union mine, was not signatory to the agreement and, therefore, did not make any contributions to the Fund. This action is brought against the trustees to recover the pension which the plaintiff claims. It is contended in his behalf that this third requirement is invalid and should be set aside by the Court as arbitrary and capricious.

The following facts were stipulated in the pretrial order. On February 18, 1965, the plaintiff applied to the defendants for a retirement pension. The application was originally approved, but later its allowance was revoked. The plaintiff had been regularly employed in the coal mining industry for more than twenty (20) years immediately prior to filing his application. During the year preceding his retirement and the filing of his application, he was employed by a coal company that was not a signatory to the agreement creating the Welfare Fund and, therefore, made no contributions to it. This fact was the ground of the rejection.

The evidence shows that out of his long period of employment in the coal industry, the plaintiff worked for over twelve years in union mines that made contributions to the Fund. He testified, by deposition, that he resigned his job with a signatory mine operator because

of unsafe conditions of work; and that he was compelled to accept employment in a non-union mine because no other employment was available and he had to support his wife and children.

In narrating why he resigned his employment with a contributing mine, he said in his deposition:

Q. 168 They didn't lay you off?

A. No, the top got so bad I got scared and quit and I wasn't making too good nohow.

As to the reason why he accepted employment in a non-contributing mine, he said:

Q. 89 How did you happen to continue to work for L & G Coal Company after you found out they weren't under contract and you a member of the United Mine Workers?

A. Well, I tell you buddy they wasn't nowhere to go hardly. Couldn't hardly find a job and I had a bunch of kids and I had to work.

■■ No contradiction of his testimony was introduced. Defense counsel, however, offered in evidence some official reports that, among other things, listed a number of union mines in operation in Harlan County, Kentucky, which is the area involved in this case, during the year in question. The Court deems this evidence incompetent on this issue. While *ex parte* Government reports may be evidence of governmental policies and of general conditions, they are hearsay and are, therefore, inadmissible as proof on specific issues in controversy. Parties are entitled to testimony of a kind that can be tested by cross-examination. Even if, however, this evidence were competent in this instance, it would have but little probative value. It does not follow that because there were union mines in operation that every coal miner could get employment there. There may have been more miners seeking employment than the union mines could absorb. Then, too, it does not appear where any of these mines were, or whether any of

them were within commuting distance of the plaintiff's home in order that he could travel daily back and forth to work, even if he could secure employment.

■ The trust involved in this case is of a type hitherto unknown to equity jurisprudence. The conventional and traditional trust of which equity takes cognizance and which it enforces, names specific beneficiaries, or a determinable class of beneficiaries, leaving no discretion to the trustees to decide who is entitled to the benefits of the trust. The only exception is a charitable trust by which a specific gift is left for a philanthropic purpose, or for members of an indefinite group as a free gift. In this instance, the trust is for the benefit of a general class, membership in which, however, has to be defined by the trustees, who have discretion to determine who within the class should be entitled to benefits under the trust. It is not a charitable trust, because it was created by agreement by contributions of employers. These contributions in a sense form part of the wages of employees, and are of a type known nowadays as "fringe benefits". Persons intended to be benefited rendered the creation of the Fund possible by working for employers who made contributions. They furnished a consideration for the payments. The result is that, unlike in a charitable trust, members of the class have a legal right to the benefits. They participated by their labors in the creation of the Fund. The trustees have authority to prescribe criteria for eligibility within the class.

■ It is part of the genius of the common law and of equity jurisprudence that they are not static but adapt themselves to shifting needs and changing conditions. Mr. Justice Cardozo summarized this doctrine in a few picturesque pointed words. He said:

"The Inn that shelters for the night is not the journey's end. The law, like the traveler, must be ready for the morrow. It must have the principle of growth."[1]

---

1. Cardozo, The Growth of the Law 18.

When social or economic conditions change, the law must follow and adjust itself to the new requirements as they become crystalized. Justice Holmes observed that, "It cannot be helped, it is as it should be, that the law lags behind the times."[2] The lag between changes of conditions and the adjustment of the law to them should not, however, be too long.[3]

■ It has been established that the courts may review decisions of the trustees on individual applications and set aside a denial, if it is arbitrary and capricious, is not supported by any evidence, or is contrary to law. The scope of review is, however, very narrow and is limited in the manner just stated. Danti v. Lewis, 114 U.S.App.D.C. 105, 108, 312 F.2d 345; Kosty v. Lewis, 115 U.S.App. D.C. 343, 346, 319 F.2d 744; Kennet v. United Mineworkers of America, D.C., 183 F.Supp. 315, 317.

■ The next step to be taken is to extend this authority of the courts to setting aside and declaring invalid a qualification for eligibility for a pension, if the Court concludes that the requirement is arbitrary and capricious. No reason is perceived for not taking this additional step. In fact, the Court of Appeals in Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425, has indicated that such power should exist. Naturally this authority should be exercised very sparingly and cautiously and may be invoked only if the arbitrary and capricious nature of the regulation is clearly established.

The Roark case, supra, dealt with the same question that is presented in this action, namely, the validity of the regulation requiring a retired coal miner to have worked for a signatory mine owner during his last year before retirement. The enlightened and analytical opinion of the Court of Appeals in that case, written by Judge Tamm, contains a helpful and detailed discussion of the problem. He said (pp. 427–428):

"While the trustees have broad discretion in setting eligibility requirements, there are obvious limits. * * * Although none of the reported cases we have found which deal with UMW pension applications has directly confronted the question of court review of eligibility requirements, we see no reason why the previously announced standard (to determine whether the trustees' conduct was arbitrary or capricious) should not apply. Trustees' action in prescribing eligibility requirements affects the rights of potential beneficiaries in the same vital way as do other trustees' actions."

\*　\*　\*　\*　\*　\*

"When the trust was first established, of necessity, most applicants had worked the bulk of the required time before signatory operators had begun paying into the trust a stipulated price per ton of coal mined.

\*　\*　\*　\*　\*　\*

"Appellants have demonstrated the peculiarities of the attacked requirement—that an employee's last regular employment before retirement be with a signatory operator. Under the requirement, employees could spend, as appellants did, practically their entire adult lives working for mine owners who had contributed to the Fund since its inception; yet if they were to work for a non-signatory operator for any period after leaving a signatory operator, they would forfeit their otherwise valid pension claims. Conversely an applicant could have worked nineteen of the required twenty years in the industry for a non-signatory operator (who had contributed nothing to the Fund) and still be eligible for a pension if only he worked his last regular employment for a contributing operator."

2. Holmes, Collected Legal Papers 294.

3. See Holtzoff, The Vitality of the Common Law in Our Time, Vol. XVI, The

Catholic University Law Review, pp. 23, 25–27.

* * * * * *

"If the Fund's purpose is to pay benefits to contributing employers' employees (whose work generated the contributions), it is difficult to see how such a requirement promotes that purpose. It makes employees like these appellants sacrifice an otherwise valid pension claim because they worked a relatively short time for non-contributing operators. The contributions which signatory operators made on their behalf did not evaporate as a result of their later employment with non-signatories."

In the exercise of caution, however, the Court of Appeals did not reach a final decision on the validity of the rule, but remanded the case to the District Court for a new trial in order that evidence bearing on a possible justification of the requirement might be introduced. The Court of Appeals indicated that the burden was on the trustees to show some rational nexus between the purpose of the Fund and the challenged requirement.

The brief concurring opinion added the following remarks (p. 429):

"Appellants may have been forced off contributing payrolls because their employers closed the mines and because no other job with a contributing employer was available. On those facts, we might well find arbitrary and capricious a reading of the eligibility requirements which would deny appellants their pensions."

In the instant case the trustees assumed the burden placed upon them by the Court of Appeals in the *Roark* case, and introduced evidence seeking to explain and justify the fairness of the requirement, which on its fact appears so highly unreasonable.[4]

Counsel for the trustees called as a witness, Joseph A. Reid who is a Special Assistant to the Director of the Fund. He testified as follows:

Q. What was the purpose and the statistical information the fund had at that time that caused them to put that requirement in effect?

A. From its inception in 1946 until March 5, 1950, the fund had received in excess of 38,000 pension applications. They found through analyses and statistics of all these 38,000 pension applications that many coal miners were coming back to the coal industry who had been away from the coal mines for many years, who had lost their identity with the coal industry, but because of the liberal requirements that were first in existence they could come back in the mines and work for one day or one week or one month and receive pension benefits. In fact, they found instances of sham and non-existent coal companies. In fact, they were referred to as "pity me" mines where a man would go for a day and then apply for a pension.

So after these three years of statistics on this subject the trustees inserted the resolution that his last year of employment had to be for a signatory company. Now this was also done because any man who did not work for a signatory company for one year immediately prior to his retirement and returned to work after 1946 could have worked for a company that never paid a cent into the welfare fund. It operates much like workmen's com-

4. The *Roark* case is on the civil non-jury calendar of this Court and is about to be reached for trial. In the interest of justice as well as to promote efficiency of its administration, the *Roark* case and the case at bar should have been consolidated for trial, especially as the civil non-jury calendar is practically current. It is to be regretted that none of the parties made a motion to consolidate. This Court would have been inclined to direct a consolidation *sua sponte*, but unfortunately the status of the *Roark* case did not come to its attention until after the trial of the instant case started and was under way.

pensation, his last year of employment must be assessed against the employer that contributes to the fund, and that is the reason this regulation was applied.

Q. Mr. Reid, following the adoption and throughout the years of administration of this welfare fund concerning this requirement of eligibility of employment immediately prior to retirement for a coal operator's signatory, what would be the percentage of the people that have been able to meet that requirement of eligibility?

A. Oh, the vast majority of the people have met that eligibility requirement. In fact, there are over 70,000 people now receiving pension benefits, and since the inception of the fund over 130,000 have been approved pension benefits.

Q. Have you in the administration of the fund encountered any difficulty in the administering of this regulation? Has it been found equitable or harsh in the administration of this welfare fund?

 \*    \*    \*    \*    \*    \*

A. We have found that this has been an equitable regulation. It has been in effect since 1950 and that is nineteen years. There has never been a great deal of clamor upon the coal miners themselves to alter this regulation. The majority of coal miners feel that this is right.

 \*    \*    \*    \*    \*    \*

Q. Mr. Reid, has there ever been any consideration within the welfare fund to change that requirement?

A. In various conferences that the administrative fund conducts discussions have periodically occurred on the whole regulation but it has never come to pass that this regulation should change.

Q. Has there ever been any consideration to increase the number of years of signatory employment to more than a year of the last employer?

A. Yes, they have discussed the possibility of making a miner work for more than one year in signatory mines but they want to be as liberal as they possibly can so they have never changed it. (Tr. pp. 8–9, 10–11, 12–13)

In the opinion of this Court, the foregoing explanation is not adequate. In order to prevent possible frauds and in order to confine the benefits of the Fund to retired employees whose labors brought about contributions to the Fund, all that is necessary is to require that the miner should have worked for a specified minimum period in signatory coal mines. To exact a requirement that irrespective of the number of years he may have been employed in such mines, he must have done likewise during the very last year of his employment in the coal industry, is unreasonable, arbitrary and capricious. The unfairness of the requirement is patent in respect to a person, such as this plaintiff, who for many years worked in a signatory coal mine, but during the last year of his work in the industry was constrained by circumstances to accept employment in a non-union mine. On the other hand, a person could have worked during his entire career in non-union mines and yet receive a pension if he managed to secure employment in a union mine for a single year immediately preceding his retirement although his participation in the creation of the Fund would be negligible. Such results are unfair and unreasonable and border on the absurd.

The Court concludes that the requirement in question is arbitrary and capricious, and should be set aside and held invalid. Since the plaintiff meets all the other requirements, he is entitled to a pension. Judgment will be rendered in his favor.

This opinion will constitute the findings of fact and conclusions of law. Counsel will submit a proposed judgment.