George SQUILLACOTE, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 83–1882.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1984.

Decided Nov. 2, 1984.

Rehearing and Rehearing En Banc
Denied Nov. 7, 1984.

Richard J. Prendergast, Chicago, Ill., for plaintiffs-appellants.

Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for defendant-appellee.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

CUMMINGS, Chief Judge.

On consideration of the government's petition for rehearing confessing error regarding this Court's jurisdiction, we have concluded that under 28 U.S.C. § 1295(a)(2) the United States Court of Appeals for the Federal Circuit normally would have had exclusive jurisdiction of this appeal. This case, however, is not in the usual posture. It has been fully briefed, argued, and decided, and we have issued our published opinion, *Squillacote v. United States,* 739 F.2d 1208 (7th Cir.1984). Our examination of the Federal Courts Improvement Act of 1982 (the "Act" or the "FCIA"), on which the government bases its petition, convinces us that transfer of the case in this situation would thwart Congressional intent and that our retention of the case is consistent with the Act's purposes. We therefore deny the government's petition which presented the jurisdictional argument for the first time after losing the case on the merits.

I

Jurisdiction in the lower court was based on 28 U.S.C. § 1346(a)(2). Section 1295(a)(2) of title 28 would vest exclusive jurisdiction on appeal of such cases in the Court of Appeals for the Federal Circuit rather than in one of the regional Courts of Appeals,

> except that jurisdiction of an appeal in a case brought in a district court under section 1346(a)(1), 1346(b), 1346(e), or 1346(f) of this title or under section 1346(a)(2) when the claim is founded upon an Act of Congress or a regulation of an executive department providing for internal revenue shall be governed by sections 1291, 1292, and 1294 of this title.[1]

If the phrase "providing for internal revenue" modifies "Act of Congress" as well as "regulation of an executive department," then the government is correct in asserting that we lack subject matter jurisdiction. Plaintiffs' counsel, however, makes several persuasive arguments that would restrict the limiting phrase's effect to the second phrase, "regulation of an executive department." The two most significant of these arguments involve accepted principles of statutory construction. First, the disjunctive "or" between "Act of Congress" and "regulation of an executive department" indicates that the phrases are alternatives and should be treated separately. See, *e.g., Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975). Second, the "doctrine of the last antecedent" would limit the phrase "providing for internal revenue" to its first antecedent, a "regulation of an executive department." *Federal Trade Commission v. Mandel Brothers, Inc.,* 359 U.S. 385, 389–390, 79 S.Ct. 818, 822–823, 3 L.Ed.2d 893; *Azure,* 514 F.2d at 900.

Nonetheless, we cannot accept plaintiffs' reasoning. First, to require a dispute over an executive regulation not pertaining to internal revenue to go on appeal to the Federal Circuit, while mandating that a dispute over the statute on which the regulation is based go on appeal to one of the regional circuits, makes no sense. In addition, the other categories excepted from the Federal Circuit's exclusive jurisdiction involve either tax matters or matters in-

---

**1.** This exception was not even quoted in the body of the government's petition for rehearing (at page 3), although it is quoted in the appendix to the petition.

volving peculiarly local law issues, such as suits to quiet title in land and tort claims against the government. See 28 U.S.C. §§ 1346(a), 1346(e), 1346(f), 1346(b). The categories are fairly narrow, and to permit appeal to the regional circuits on any matter involving an Act of Congress, when matters involving the Constitution and executive regulations not pertaining to internal revenue must go to the Federal Circuit, seems too anomalous a result to allow. Furthermore, rejecting plaintiffs' argument accords with the decisions in *Oliveira v. United States*, 734 F.2d 760 (11th Cir. 1984); *Spagnola v. Stockman*, 732 F.2d 908, 909 n.2 (Fed.Cir.1984) (footnote by Chief Judge Markey describing the exceptions clause at issue here as relating to "tax cases"); and *Corwin v. Lehman*, 724 F.2d 1577 (Fed.Cir.1984), certiorari denied, — U.S. ——, 104 S.Ct. 2680, 81 L.Ed.2d 876.

Because the statutory language is ambiguous and because transferring the case at this late date is a drastic remedy, we do not end our inquiry with this conclusion. The Senate Report accompanying the Act states explicitly that "[t]he Committee intends for the jurisdictional language to be construed in accordance with the objectives of the Act." S.Rep. 275, 97th Cong. 2d.Sess. 20, reprinted in 1982 U.S. Code Cong. & Ad.News 11, 30.[2] Our review of the broad purposes of the Act convinces us that we can effect those purposes only by denying the government's belated request.

## II

The majority of the legislative history accompanying the enactment of the FCIA centers on the need for centralized review of patent appeals. See *id.* at 2–7, reprinted in U.S.Code Cong. & Ad.News 11, 12–17; 127 Cong.Rec. H8389–H8392 (1981) (Rep. Kastenmeier, bill co-sponsor); 127 Cong. Rec. S14692–14696, S14721–S14722 (Sen. Dole, bill co-sponsor). A second purpose,

however, was to "improve[ ] the administration of the system by reducing the number of decision-making entities within the federal appellate system." S.Rep. 275, *supra*, at 3, reprinted in 1982 U.S. Code Cong. & Ad. News 11, 13. Senator Dole, the co-sponsor of the Act, remarked in introducing the legislation that the "present system requires a case to be considered at two separate levels within the U.S. Court of Claims before a claimant's rights can be fully adjudicated." 127 Cong.Rec. S14692 (1981). The legislation addressed this fault by merging the Court of Claims with the Court of Customs and Patent Appeals into a new Article III forum, the Court of Appeals for the Federal Circuit. The bill, said Rep. Kastenmeier, the legislation's sponsor on the House side, "substantially improves the administration of the law in the areas of patents, government contracts, trademark and international trade; * * * and results in improved functioning of the Federal appellate system." *Id.* at H8389. He defined the bill's purpose as being to alleviate the heavy caseload on the circuit courts and to provide uniformity in patent law. *Id.* at H8390.

In the current case no patent issues are at stake. Consequently the only statutory purpose that might be affected is the one of efficiency in the appeals process. That being so, insuring that our decision fulfills this intent gains in importance. Our acceding to the government's request would sabotage the goals of the legislation. It would require the parties to reenact the process already fully complied with in our courtroom, thereby imposing additional and unnecessary delays and expense on both parties and on our judicial resources. The government does not quarrel so far with our disposal of the merits of the case; its only present complaint is the jurisdictional one. Nevertheless, our granting the government's request would eviscerate the very purposes for which Section 1295 was written. It would in fact condone the very

---

**2.** We are also mindful of the Report's insistence that the proposed change was a modest one in the federal court system, and that the jurisdiction of the Court of Appeals for the Federal

Circuit is to be construed strictly. See S.Rep. 275, *supra*, 7, 19–20, reprinted in 1982 U.S. Code Cong. & Ad. News 11, 17, 29–30.

forum-shopping repudiated by Congress in enacting the FCIA. The Senate Report stated, "The Committee is concerned that the exclusive jurisdiction over patent claims of the new Federal Circuit not be manipulated. * * * It is not intended to create forum shopping opportunities between the Federal Circuit and the regional courts of appeals on other claims." S.Rep. 275, *supra*, at 19–20, reprinted in 1982 U.S. Code Cong. & Ad. News 11, 29–30. Although this statement addresses specifically the possibility parties would add spurious patent claims to claim the jurisdiction of the Federal Circuit, the reasoning applies to the instant situation in which the government is using the Act blatantly to forum-shop. We will not allow the government to so frustrate the purposes of the FCIA, and we do not believe that Congress intended such a result to occur. We do not question that this is, in general, the kind of case Congress intended for review by the Federal Circuit, but, as our discussion of legislative intent illustrates, this is a rare exception to the jurisdictional scheme, which is dictated by the purposes underlying the FCIA. The unusual posture of this case guarantees that our decision is a very limited one. Only after a case has been fully argued and decided in a situation in which both the statutory meaning is ambiguous and allowing transfer would defeat the purpose of that statute would our decision be permissible.[3]

Policies underlying the area of jurisdiction in general further buttress the result we reach. Professor Wright, in his hornbook on the federal courts, approves the reminder of former Justice Benjamin Curtis that questions of jurisdiction are " 'questions of power as between the United States and the several States.' " C. Wright, The Law of Federal Courts 1 (4th ed. 1983). He admits that permitting even those parties who had themselves invoked federal jurisdiction to challenge that jurisdiction after they have lost on the merits is a "harsh rule." *Id.* at 23. He can justify this rule only on the basis of "the delicate problems of federal-state relations that are involved." *Id.* Professors Hart and Wechsler, as well as the American Law Institute, severely criticize the rigid position that Professor Wright and the current state of the law would accept. See Hart and Wechsler's The Federal Courts and the Federal System 837–839 (2d ed. 1973); American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 64–65, 370–374 (1969). The ALI would not permit issues of subject matter jurisdiction to be raised after the beginning of trial, unless the court finds that the parties have colluded or the parties could not reasonably have been expected to raise the issue earlier. American Law Institute, *supra*, § 1386. The Reporters explained their belief that it "is necessary and proper

---

**3.** Opponents of the Act voiced two main objections: that the new Court would construe its own jurisdiction too liberally, and that it would be a "specialized court." While our refusing to transfer this case might be interpreted to realize the second concern, by denying to the Federal Circuit the opportunity to hear the case and thus limiting the variety of its docket, any actual impact is negligible. The Court's decision, limited as it is to one case only in very special circumstances, cannot measurably deprive the Federal Circuit of a rich and diverse docket.

The government might also argue that our decision itself actually subverts Congressional intent by defeating uniformity of decision. Any impact on uniformity is also negligible. The number of cases in which the government raises its jurisdictional challenge in a timely fashion illustrates how unlikely this precise situation is to arise again. See, *e.g., Oliveira v. United States, supra.* Since this case is a class action,

controversy over the Congressional Acts at issue here will not arise again. While the issue of the effect of a freeze on salary increases might again be disputed in the future, it nonetheless is one that arises only infrequently. By that time litigants, especially the government, will be more attuned to when Section 1295 applies, so that they will surely raise the jurisdictional issue in a timely fashion. And nothing indicates that our decision on the merits conflicts in any way with other circuits' resolution of any similar situation.

If this case had turned on patent law, the calculus might have been different. Then, given the importance of patent cases in the formation of the Federal Circuit, we might have decided that effectuating Congressional intent required transfer to the Federal Circuit, regardless of the impact on judicial efficiency. The instant case, however, does not present that very different situation.

to the exercise of Article III power that procedures be devised to require issues of jurisdiction to be timely raised, and to prevent their use to take unfair advantage of opposing parties or to impede the administration of justice." American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 108–109 (Official Draft 1965). Application of this proposal to this case would automatically foreclose the government's claim, because, even if the government's argument is correct, it could have discovered the defect earlier had it been exercising reasonable diligence. It would now be foreclosed from raising the issue as the objection has become untimely.

This position gains force when the crucial factor—federal-state relations—is absent. Indeed, this case implicates no issues of federalism, for the question is not one of the federal courts' power to hear the case.[4] In fact one can discern a more flexible approach to subject matter jurisdiction when federal-state relations are not at stake. *Estate of Watson v. Blumenthal*, 586 F.2d 925 (2d Cir.1978), is instructive. There the plaintiffs were attempting to avoid the exclusive jurisdictional provisions of 28 U.S.C. § 1491, which withdrew jurisdiction from the district courts and vested it in the Court of Claims. They argued that the unavailability of equitable relief in the Court of Claims precluded their being able to attain adequate relief.[5] The Second Circuit correctly rejected this argument, realizing that to do otherwise would "destroy[ ] the jurisdiction of the Court of Claims" by allowing every plaintiff to make similar claims. *Id.* at 934.[6] While the court did not address the opposite problem of a case that would defeat the jurisdiction of the Court of Claims only minimally, its consideration of legislative intent in establishing the Court of Claims suggests that an interpretation of the statute in another case that did not do such damage to the very core of the Court of Claims's jurisdiction might have been more favorably received.

Similar is *Municipal Intervenors Group v. Federal Power Commission*, 473 F.2d 84 (D.C. Cir.1972), involving the Temporary Emergency Court of Appeals. That court was also a national court of appeals. It was established to promote uniformity of decision and to protect the President's anti-inflation program. The issue there involved public utility rate increases that the Federal Power Commission had allowed pursuant to the guidelines of the Economic Stabilization Act of 1970, as amended. This Act provided for appellate review in the Temporary Emergency Court of Appeals rather than in the regional circuits. Consequently, any decision rendered by a regional circuit would have contravened both of Congress's goals by allowing "the possibility of conflicting rulings by intermediate United States appellate courts, and danger to the anti-inflation program." *Id.* at 89.

Contrast that situation to the current one, and the differences are apparent. In the case now before us, the only legislative goal to be affected is that of judicial efficiency,[7] and allowing transfer would in fact make achieving that goal impossible. *Transcontinental Gas Pipe Line Corp. v. Federal Energy Regulatory Commission*, 659 F.2d 1228 (D.C. Cir.1981), underlines

---

**4.** For an example of the issue of Article III power to hear a case, see, *e.g., Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274, and this Court's opinion in *Sadat v. Mertes*, 615 F.2d 1176 (7th Cir.1980).

**5.** The FCIA, when it established the Claims Court to inherit the trial jurisdiction of the now-defunct Court of Claims, removed this restriction that had previously limited its predecessor. See 28 U.S.C. § 1507; S.Rep. 275, *supra*, at 22, reprinted in 1982 U.S. Code Cong. & Ad. News 11, 32.

**6.** Accord, *S.J. Groves & Sons Co. v. United States*, 495 F.Supp. 201, 209 (D.Colo.1980) (plaintiff requesting equitable relief that was a mask for monetary damages; court held that for it "to grant relief in excess of the jurisdictional limits of the Court of Claims in this case would undermine the jurisdiction of both").

**7.** Uniformity was seen not to be affected by this case in footnote 3, *supra.*

the importance of determining and implementing Congressional intent in a situation similar to the one now before us. This case also involved the Temporary Emergency Court of Appeals. If the D.C. Circuit had decided that the Federal Energy Regulatory Commission, the successor Commission to the Federal Power Commission, had acted pursuant to the Economic Stabilization Act of 1970, only the Temporary Emergency Court of Appeals would have had appellate jurisdiction. But if that Commission had acted under the Natural Gas Act, the D.C. Circuit would have had jurisdiction. The Commission had stated that the contested rate increase "was disapproved only because of its 'inconsisten[cy] with the Economic Stabilization Program.'" *Id.* at 1235 (quoting FERC Order). Such language shows that the disapproval was predicated on the Economic Stabilization Act, so that prior decisions by the D.C. Circuit in which the court had stated that it would not review orders "'raising * * * issues which appear inextricably interwoven with issues arising under the Economic Stabilization Act * * * until review by the District Court and [the Temporary Emergency Court of Appeals] is completed,'" *id.* at 1237 (quoting *Connecticut Municipal Group v. Federal Power Commission*, 498 F.2d 993, 998 (D.C. Cir.1974)), would be relevant. Nonetheless, the court accepted the Commission's argument that "it was simply importing Stabilization Act principles into the Gas Act" in an attempt "to harmonize the two statutes." *Id.* at 1235. It might be argued that the court's decision ultimately rested on judicial deference to an administrative agency's interpretation of its own order and so is inapposite. But the court's ratification of the Commission's close examination of legislative intent, and its reluctance to deny jurisdiction to the regional circuits unless Congress had mandated clearly that doing so was its intent, indicate that our approach is the correct one.

The differing effects on Congressional intent explain and justify the various results reached in these three cases. What is most relevant about these cases is their close attention to legislative intent. The courts did not explain their results by reference to strict jurisdictional precepts about power. Instead their approach was to examine legislative intent and how that intent might best be served.[8] The Supreme Court adopted a similar tactic when dealing with judicial review of administrative agency action in *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203. The issue involved a conflict between the Shipping Act and the Administrative Orders Review Act. The Shipping Act provided that appeals of orders involving the Maritime Commission were to be taken in the same manner as orders of the Interstate Commerce Commission, in which event the district courts would have had jurisdiction over appeals when the district courts themselves originally referred the cases to the Maritime Commission. The Administrative Orders Review Act, on the other hand, would have required all appeals to be taken directly to the courts of appeals. The Supreme Court examined the legislative history of both Acts and concluded that "to make the procedure adopted [for review of cases referred to the Commerce Commission] applicable to maritime cases would vitiate the scheme of the Administrative Orders Review Act." *Id.* at 70, 91 S.Ct. at 209. Consequently review could not be had in the district courts but must be had in the courts of appeals, despite express statutory language indicating otherwise. Congressional intent was the operative factor determining jurisdiction.

A fundamental concern in each of the many cases dealing with the division of jurisdiction between the courts and administrative agencies, and the appropriate court to which to bring an appeal, is Congressional intent. The Supreme Court dealt with the problem in *Rederiaktiebola-*

---

**8.** Note too that the jurisdictional issue was raised in a timely fashion, so that a concern for judicial inefficiency resulting from a dismissal of the case was not a factor in any of these cases.

*get Transatlantic,* 400 U.S. at 68–69, 91 S.Ct. at 208; that case provides but one example. The nuances of the issue suggest the presence of a separation of powers problem, similar in quality if not in degree, to that confronting the courts when federal-state concerns are at issue. Because the jurisdiction problem had been raised in these cases in a timely fashion, the courts have not had the opportunity to examine the effect delay in raising the issue might have on Congressional intent in a given case. The flexibility courts sometimes accord to the jurisdictional issue in even the case of administrative agencies is seen in *Mansfield v. Weinberger,* 298 F.Supp. 965, 967 n.5 (D.D.C.1975), in which the court accepted without discussion Secretary Weinberger's waiver of the requirement that agency action appealed from be final. Lack of finality ordinarily would have precluded review; the court's glancing treatment of the issue in a footnote suggests that subject matter jurisdiction assumes the same footing of other issues a party may raise when statutory competence rather than federalism and Article III power is at issue.

Cases treating untimely removal from state courts to federal courts also support this conclusion. Removal itself impacts on the power of the state courts to hear a cause of action so that federalism concerns are operative. See, *e.g., Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–109, 61 S.Ct. 868, 872, 85 L.Ed. 1214. Nonetheless federal courts do allow waiver to prevent "fundamental unfairness." *Maybruck v. Haim,* 290 F.Supp. 721, 724 (S.D. N.Y.1968). They do so even when their refusal to remand restricts a state's judicial authority and even when the removal petition itself contravenes the Congressional statute. Also of interest is that different removal statutes may be construed differently, depending on Congressional intent. See *Manas y Pineiro v. Chase Manhattan Bank,* N.A., 443 F.Supp. 418 (S.D.N.Y. 1978), construing the removal statute in 12 U.S.C. § 632 more narrowly than similar removal statutes governing certain criminal cases and tort claims involving the

United States. Differing Congressional policy for the various statutes explained and justified the district court's remand to the state court. *Id.* at 420–421. Both the willingness to consider doctrines such as waiver and the examination of Congressional intent acknowledge implicitly that jurisdictional concerns when statutory competence alone is challenged lack the urgency and the special character of such claims when the scope of Article III power is being decided.

Not only Congressional intent, but also fairness may persuade a court to ignore the otherwise clear dictates of a statute. Cases involving estoppel provide a clear example with some relevance for the issue before us. In *Portmann v. United States,* 674 F.2d 1155 (7th Cir.1982), this Circuit approved the application of estoppel against the government "even where [it] is acting in a sovereign capacity 'if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel.'" *Id.* at 1167 (quoting *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973)). Those two factors manifestly support our decision in this case. Not only has the government unconscionably delayed its discovery of the possible jurisdictional defect, but its petition for rehearing deceptively handled the matter by neglecting to deal with the exceptions clause in Section 1295(a)(2) that on its face appears to deprive the Court of Appeals for the Federal Circuit of jurisdiction. The government's conduct forced the plaintiffs to surmise what the government's interpretation of that clause might be, a position made doubly unfair by the long delay on the government's behalf in raising the issue. It might be argued that the plaintiffs cannot blame the government, for the disputed provision is a statutory one of which they, as well as the government, are charged with knowledge, but this answer will not do. The provision is ambiguous, and as shown above, appears to exempt from its purview Section 1346(a)(2) actions involving

Congressional legislation. The plaintiffs' interpretation of the provision, then, is certainly understandable, so that they cannot be charged with neglect. This is especially so since the government, which deals with Section 1295 on a daily basis, evidently failed itself to realize that Section 1295(a)(2) might not exempt this case from being heard by this Court.

In addition to the government's conduct and the public interest, this Circuit requires the consideration of whether estoppel would "undermin[e] important federal interests or risk[ ] a severe depletion of the public fisc." *Portmann*, 674 F.2d at 1167. Contrary to undermining federal interests, refusing to transfer would actually promote those interests by furthering Congressional intent underlying the FCIA. Nor would a "severe depletion of the public fisc" occur. A substantial amount of money is at stake, but our transferring the case would not guarantee that the Federal Circuit would reach a position on the merits any different from the one we have reached. In fact, our decision on the merits is unchallenged in the rehearing petition, so that the Federal Circuit would seemingly conclude the same. Moreover, the situation before us is very unlike those cases, such as *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685, deciding whether certain benefits should be awarded in contravention of "valid regulations governing [their] distribution." *Id.* at 788, 101 S.Ct. at 1470. Our decision on the merits awards to the plaintiffs those sums that the government has unlawfully withheld from them. Those sums are not benefits deriving from government largesse, such as the welfare payments in *Schweiker*, but represent unpaid salary for which the plaintiffs labored and to which they are entitled. The case before us is not strictly an estoppel case, but the principles underlying such cases are sufficiently analogous to support the result reached here. This is especially true since our result accords with Congressional intent and awards the plaintiffs no windfall but merely gives them their unpaid salary that is their just due.

The government may argue that unfairness and prejudice to the plaintiffs and the impact on judicial efficiency are negligible here given the ease with which this case could be transferred to the Federal Circuit under 28 U.S.C. § 1631. That we could do so at this date is not crystal clear. First, the wording of the statute suggests that it operates to allow courts to transfer cases before argument, as "[w]henever a civil action is filed in a court * * * and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such * * * appeal to any other such court in which the * * * appeal could have been brought at the time it was filed." The use of the phrase "[w]henever a civil action is filed" suggests that the appeal would be transferred as soon as possible, or at least when the jurisdictional defect was raised in oral argument. After a decision on the merits, the situation might very well be different and the opportunity to transfer lost. More importantly, the Section provides for transfer only if transfer would be in the interest of justice, a requirement not at all met in the instant situation. See *Hempstead County and Nevada County Project v. United States Environmental Protection Agency*, 700 F.2d 459, 462 (8th Cir.1983) (proper analysis is to determine first whether a want of jurisdiction exists; second, whether transfer would be in the interest of justice; third, to transfer the action); *Slatick v. Director, Office of Workers' Compensation Programs, United States Department of Labor*, 698 F.2d 433, 434 (11th Cir.1983) ("the dispositive question in this case is whether a transfer * * * would be in the interest of justice"). Transfer in the case before us would give the government a second bite at the apple and only result in needless expense and waste for the plaintiffs, the judges of the Federal Circuit, and ourselves. The government here leaves untouched the merits of the decision, and presumably the Federal Circuit would reach the same conclusion we have. Giving the government an additional opportunity to re-argue a decision that has already

been fully considered would be grossly unfair. Consequently Section 1631 should be unavailable.[9]

This Court's refusing to transfer at this late date is not without precedent. *Milburn v. United States*, 734 F.2d 762 (11th Cir.1984), is an opinion authored by Chief Judge Markey of the Federal Circuit, who was sitting by designation. Despite the plaintiff's claims there being based in part on 28 U.S.C. § 1346(a)(2), and despite that same panel's *per curiam* decision, on the same day, in *Oliveira v. United States, supra,* to transfer for want of subject matter jurisdiction a claim also based in part on Section 1346(a)(2), the Eleventh Circuit heard and decided *Milburn* on the merits. Very likely the jurisdictional issue was not raised or considered, but that the panel would transfer one case and decide the other the same day without noticing the jurisdictional problem at all seems incredible. That they did hear *Milburn* and decide it on the merits suggests that 28 U.S.C. § 1295 both lacks the absolute quality the government would give it and lacks the import of statutes regulating federal-state relations.

The government's petition for rehearing is denied.

---

**9.** An alternative reading of Section 1631 would reach a different result. That result would require us to dismiss the case, if we could not transfer it because doing so would not promote justice. Before the enactment of Section 1631, the only alternative available when a court lacked subject matter jurisdiction was to dismiss the case. Inequities resulted when a party purposefully waited until very late in the litigation and after the expiration of the relevant statute of limitations for filing in the appropriate court before raising the jurisdictional question. This statute would prevent the harsh result of dismissal in such an instance by allowing transfers to promote justice. If this is the extent of the Section's reach, then it cannot operate to permit a court to choose either to retain jurisdiction or to dismiss when, as here, transfer would not be in the interest of justice.