EMPIRE KOSHER POULTRY, INC., Appellant,

v.

HALLOWELL, Penrose Van Buskirk, Jr., Max A. Block, John Apple, John Sharman, Euclid C.

No. 86-5411.

United States Court of Appeals, Third Circuit.

Argued Feb. 17, 1987.

Decided April 24, 1987.

J. Jay Cooper (argued), Goldberg, Katzman & Shipman, P.C., Harrisburg, Pa., for appellant.

LeRoy S. Zimmerman, Atty. Gen., Ellis M. Saull, Deputy Atty., Gen. (argued), Gregory R. Neuhauser, Sr. Deputy Atty. Gen., Andrew S. Gordon, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Philadelphia, Pa., for appellees Penrose Hallowell and Max A. Van Buskirk, Jr.

James J. West, U.S. Atty., Sally A. Lied, Asst. U.S. Atty., U.S. Dept. of Justice, Harrisburg, Pa., James Michael Kelly, Associate General Counsel, Raymond W. Fullerton, Asst. General Counsel, Aaron B. Kahn, Atty. (argued), Office of the General Counsel, U.S. Dept. of Agriculture, Washington, D.C., for appellees John Block, John Apple and Euclid C. Sharman.

Before GIBBONS, Chief Judge, SLOVITER, Circuit Judge, and SCIRICA, District Judge *.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

Empire Kosher Poultry, Inc. appeals from a summary judgment in favor of the defendants in its action seeking compensation for losses incurred as a result of a quarantine of poultry owned by Empire, imposed to prevent the spread of avian influenza. The defendants include officials of the Pennsylvania Department of Agriculture (PDA) (state defendants) and officials of the United States Department of Agriculture (USDA) (federal defendants).[1] Empire contends that the quarantine was a taking of its property for public use without compensation, that it was imposed in violation of due process, and that its imposition denied Empire equal protection of the law. The district court rejected these contentions. We will affirm. The federal defendants have moved to transfer this appeal to the Federal Circuit. We will deny that motion.

## I.

### The Undisputed Facts

On April 22, 1983, a mild form of avian influenza was discovered in Lancaster County, Pennsylvania. Avian influenza is a viral infection that affects poultry but not humans. It is primarily transmitted through the movement of live, infected poultry. During the period involved in this action, there was no scientific procedure which could guarantee that a particular flock was not infected with the avian influenza. While a bird might have tested negatively, it might have either developed or been exposed to the disease before the test results were available. Thus an eradication program was necessary to protect the poultry industry, valued at ten billion dollars with exports of one-half billion dollars per year, and to protect the best low-cost source of protein for the public. At first the Commonwealth quarantined only the infected premises. Because the disease later became highly pathogenic, having the ability to cause extensive tissue destruction and death in poultry, in November, 1983 the PDA and the USDA established a quarantine zone covering several counties in Pennsylvania. Both departments also promulgated regulations that restricted the movement of poultry.

The USDA regulations restricted the movement of poultry from the quarantine zone to locations outside Pennsylvania, whereas the state regulations covered intrastate movements. Initially, the USDA regulations did not permit poultry located in the quarantine zone to be moved out of the state. On November 16, 1983, how-

---

* Hon. Anthony J. Scirica, Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. The state defendants are Penrose Hallowell, Secretary of PDA, and Max A. Van Buskirk, Jr., Director of the Bureau of Animal Industry of the PDA. The federal defendants are John Block, United States Secretary of Agriculture,

Dr. Euclid Sharman, Assistant Deputy Administrator for the Animal Health Program of the Animal and Plant Health Inspection Service, Veterinary Services, USDA, and Dr. John Atwell, Deputy Administrator for the Animal Health Program of the Animal and Plant Health Inspection Service, Veterinary Services, USDA.

ever, the USDA expanded the quarantine zone but provided that poultry under permit that had been inspected and found to be free of avian influenza could be moved within, or taken out of the quarantine zone for immediate slaughter. In November, 1983 the state regulations also allowed poultry to be moved from the quarantine area for slaughter. Permits were issued by the Avian Influenza Eradication Task Force that had been established by the USDA.

On December 8, 1983 the USDA revised its regulations to prohibit generally interstate movements of live poultry from the Pennsylvania quarantine area. The USDA itself, however, was permitted to move poultry for diagnostic or experimental purposes. Additionally, on December 23, 1983, the PDA similarly revised its regulations to prohibit the intrastate movement of live poultry from the quarantine area. These added restrictions were imposed because of the continued spread of the disease within the quarantine zone. For the same reason, on December 27, 1983, the quarantine zone was enlarged. Despite the quarantine, poultry that had been slaughtered and processed within the zone could be shipped anywhere without violating USDA regulations.

Empire processes kosher poultry products for worldwide distribution and sale. Kosher chickens must be raised, slaughtered and processed according to strict religious practices and procedures. Although it is more costly to produce kosher poultry, the required process yields more meat per bird. At the end of November, 1983 Empire operated three processing plants in the towns of Bird-in-Hand, Mifflintown, and Mount Union, Pennsylvania. Empire estimates that it had 340,000 chickens in the quarantine zone at the time the regulations were revised in December, 1983, all of which, Empire claims, were found at that time to be free of the disease. Those chickens were scheduled to be slaughtered in late February or early March, 1984. In late December 1983 or early January 1984, Empire was still placing poultry within the quarantine zone on farms operated by its contract growers. On January 17, 1984 Empire voluntarily closed its Bird-in-Hand plant, which was located within the quarantine zone. The Mifflintown and Mount Union plants were not within the quarantine zone.

In early February, 1984 Empire, then without a processing plant within the quarantine zone, requested permission of the PDA to move live poultry out of that zone to its plant in Mifflintown for immediate slaughter. On February 6, 1984, Dr. Max A. Van Buskirk, Director of the Bureau of Animal Industry in the PDA preliminarily recommended to Penrose Hallowell, the Pennsylvania Secretary of Agriculture, that, upon permit, live uninfected poultry be allowed to be taken out of the quarantine zone for immediate slaughter. In early February, Dr. Van Buskirk discussed this recommendation with Dr. Euclid Sharman of the USDA, who told him that he did not concur but that he would discuss the matter with his staff. Dr. Sharman subsequently discussed Van Buskirk's proposal with Dr. John K. Atwell, Deputy Administrator of the Animal and Plant Health Inspection Service [2] and with two staff members, Dr. William Buisch and Dr. Allen Furr. All agreed that Van Buskirk's proposal was inappropriate because there was no way to insure that the poultry was disease-free and because the outbreak of the disease had not then been brought under control.[3] Furthermore, if the state had adopted Van Buskirk's recommendation, Sharman would have recommended that the federal quarantine area be expanded to encompass the entire state of Pennsylvania. At that time, the USDA quarantine extended only to all or parts of nine counties. In any case, the final decision of the PDA was to deny Empire permission to move its live poultry out of the quarantine zone for slaughter.

On February 9, 1984 Empire brought an action against the Commonwealth of Penn-

2. This is the agency within the USDA which administered the federal quarantine.

3. There is no evidence that this fact was communicated to any state official prior to the commencement of this litigation.

sylvania in the United States District Court for the Middle District of Pennsylvania, seeking a preliminary injunction to permit it to move its live poultry outside the quarantine area. *See Empire Kosher Poultry, Inc. v. Pennsylvania*, Civ. No. 84–0196. After a hearing on February 14, 1984, the district court denied the motion on February 15, 1984. On March 21, 1984, Empire voluntarily dismissed, without prejudice, the February 9, 1984 action.

Meanwhile, on February 22, 1984, a flock of 79,000 birds owned by Empire, which was being raised by a farmer within the quarantine zone at Rehresburg, Pennsylvania, was found to have avian influenza. More than 74,000 of these birds were therefore destroyed on February 24, 1984. Empire, pursuant to 9 C.F.R. § 81.15 (1984), sought and received compensation from the federal government for its loss from the destruction of this poultry in the amount of $121,959.58 in March or April 1984.[4] On April 9, 1984 Empire also submitted a claim to the USDA for compensation for its losses incurred because it was unable to move its chickens outside the quarantine zone to be slaughtered. Empire claimed that the restriction on movement forced it to sell its birds at a substantial loss (below its cost) to other processors who had plants within the zone, and to buy substitute chickens for its kosher outlets outside the zone. The USDA denied this claim on April 17, 1984 because it did not fall within the reimbursement regulations—i.e., the claim did not involve a loss of chickens destroyed due to infection or exposure to avian influenza.

## II.

### Proceedings in the District Court

On October 24, 1984 Empire filed the instant action. It seeks $66,507.27 plus interest and cost of suit. Empire asserts that the federal and state officials, by enforcing the quarantine restrictions that prevented it from removing its live chickens for processing outside the zone, caused a "taking" of its property without just compensation, and deprived it of its property without due process of law, by arbitrarily and capriciously imposing an unnecessary quarantine. Empire also claims that the USDA reimbursement provisions which compensated owners of poultry that was destroyed pursuant to the quarantine regulations denied equal protection of the law to poultry owners such as Empire who were injured in different ways because of the quarantine.

Both the federal and state defendants filed motions for summary judgment. On February 25, 1986, a United States Magistrate filed a report that recommended granting summary judgment for both sets of defendants. Empire filed exceptions and thereafter, on May 23, 1986, the district court issued a Memorandum and Order granting all defendants summary judgment. This appeal followed.

## III.

### Due Process and Equal Protection

 Empire claims that the regulations imposing the quarantine deprived it of substantive due process. It claims, as well, that the regulations permitting compensation for slaughtered poultry but not for other forms of damage deny it equal protection of the law. The action against the state defendants is predicated on 42 U.S.C. § 1983 (1982). The action against

---

**4.** 9 C.F.R. § 81.15 (1984) provides in relevant part:

(a) A claim for payment for destruction of poultry, carcasses or parts thereof, eggs, products, or articles must be presented to the Director of the Task Force before payment will be made. The claimant must state whether the items for which payment is requested are, or are not, subject to a mortgage, lien, or other security or beneficial interest held by any person other than the claimant. If the claimant is the owner and states that there is

no mortgage, lien, or other such interest on the items, payment will be made to the owner. If the claimant states that there is a mortgage, lien, or other such interest, a VS Form 1–23 shall be signed by the claimant and by each person holding a mortgage, lien, or other such interest on the items, consenting to the payment of any indemnity allowed to the person specified thereon, and payment will be made to such person.

9 C.F.R. § 81.15(a) (1984).

the federal defendants, according to Empire, arises directly under the United States Constitution. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The United States contends that because the federal defendants were served in their official capacity pursuant to Fed.R.Civ.P. 4(d)(5) rather than as individuals pursuant to Fed.R.Civ.P. 4(d)(1) the entire complaint should be construed as seeking recovery only from the federal treasury. If it were so construed, the district court would not have had subject matter jurisdiction because the claim exceeds $10,000. *See* 28 U.S.C. §§ 1346(a)(2), 1491 (1982). (The United States Claims Court has exclusive jurisdiction over actions seeking damages from the United States in excess of $10,000 premised on the federal constitution, federal statute, regulation, or government contract). A possible reading of the complaint, however, suggests that recovery is sought both against the United States defendants individually and against the federal fisc. The United States has not, however, consented in the Tucker Act to suits predicated upon the substantive due process or equal protection components of the fifth amendment. *See, e.g., De Vilbiss v. SBA,* 661 F.2d 716, 718 (8th Cir. 1981); *Duarte v. United States,* 532 F.2d 850, 852 (2d Cir.1976); *Willis v. United States,* 600 F.Supp. 1407, 1412–13 (N.D.Ill. 1985); *Bounds v. United States,* 1 Cl.Ct. 215, *aff'd,* 723 F.2d 68 (Fed.Cir.1983); *Grundy v. United States,* 2 Cl.Ct. 596 (1983). The failure to serve the federal defendants pursuant to Fed.R.Civ.P. 4(d)(1) was not raised in the trial court, which treated the action as one against the federal defendants individually. Thus any defect in personal service has been waived. *See* Fed.R.Civ.P. 12(h)(1); *cf. Michlus v. Carlson,* 632 F.2d 227, 240 (3d Cir.1980) (claim of defective Rule 4(d)(1) service preserved in trial court). Substantive due process and equal protection claims implied directly from the United States Constitution against federal officials individually may be entertained in the district court. *E.g., Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The

Tucker Act is not implicated in such claims, and hence they can be addressed in the district court rather than in the Claims Court. *See Kotarski v. Cooper,* 799 F.2d 1342, 1345 (9th Cir.1986); *VanDrasek v. Lehman,* 762 F.2d 1065, 1070 (D.C.Cir. 1985). Thus we proceed to the merits of the substantive due process and equal protection claims.

### A.

### Substantive Due Process

The Supreme Court in *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), set forth the applicable substantive due process standard: "The guarantee of due process demands only that the law shall not be unreasonable, arbitrary or capricious and that the means selected shall have a real and substantial relation to the object sought to be obtained." *Id.* at 523, 54 S.Ct. at 509. In *Williamson v. Lee Optical Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), the Court also stated that "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 488, 75 S.Ct. at 464. Moreover, when presenting a due process challenge to a regulation, the challenging party must show that there is no rational connection between the regulation and the interest which the regulation promotes. *See Harrah Independent School Dist. v. Martin,* 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979) (per curiam); *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976).

Claiming that the actions of the government officials were arbitrary and unreasonable, Empire raises three points: a) that the defendants have not provided scientific evidence that establishes the reasonableness of their regulations insofar as they forbid removal of uninfected poultry from the quarantine zone for immediate slaughter; b) that the regulations at issue are arbitrary because they are stricter than regulations promulgated in Southern Cali-

fornia in similar circumstances; and c) that the geographical perimeters of the quarantine zone are too broad.

■ It is undisputed that avian influenza can be spread by the transportation of live poultry which tested negatively for the disease but which developed or was exposed to it in the three to six days required for receipt of test results. Indeed Empire's argument is undermined by a possible scenario based on the facts presented here. On February 22, 1984 a flock of Empire's chickens was discovered to be infected with the flu and was therefore destroyed. A possible scenario could have been that if that flock, having been infected after testing, had been allowed to move outside the zone based on negative test results, it would have posed a threat to poultry outside the zone since the disease is transmitted through live chickens. Thus we reject Empire's first contention.

■ Empire's second contention is equally unpersuasive. Empire seeks to demonstrate the arbitrariness of the regulations here by attempting to compare the Pennsylvania regulations with regulations in effect in the early 1970s in Southern California. The California regulations were promulgated to prevent the spread of Newcastle's disease, a different disease than avian influenza. Empire contends that the fact that the movement of live poultry was permitted in the California situation demonstrates that the restriction here was arbitrary. This argument has no record support. There is no evidence of the similarities or differences of the two diseases, how they are spread, whether the same lag period is possible between testing and availability of test results, or whether Newcastle disease can be contracted in that period. In any event, the district court adequately answered this contention. No actual movement of noninfected, nonexposed poultry was permitted by the federal task force in California until the disease had been brought under control. As the district court also pointed out, the California experience that eradication is simplified by prohibiting movement of poultry could logical-

ly have prompted the officials in the present case to issue stricter prohibitions.

■ Finally, Empire's claim that the geographic boundaries of the quarantine were overly broad is also without merit. The boundaries were selected to cover areas of known infection and to include a five-mile buffer zone so that they could be readily identifiable, thereby avoiding poultry being inadvertently shipped through or out of the quarantine areas. *See* 48 Fed.Reg. 57,474 (1983); 48 Fed.Reg. 52,420–21 (1983); 48 Fed.Reg. 51,422 (1983). The boundaries thus clearly bore a rational connection to the objective sought.

We hold, therefore, that there was no violation of Empire's substantive due process rights and that summary judgment on this issue in favor of all the defendants was appropriate.

B.

*Equal Protection*

Empire claims that 9 C.F.R. § 81.15 (1984) denied it equal protection because the regulation provides only for indemnity to poultry owners whose chickens are destroyed because they are infected with avian influenza, and not to poultry owners like itself who are unable to use its chickens at its processing plants. Empire reasons that the restrictions imposed by the PDA and the USDA treated Empire as if its poultry was in fact infected, thereby subjecting Empire "to the same burdens as all of the other poultry owners within the quarantine zone" without "the benefits" afforded them. *See* Empire's Brief at 34.

■ Empire concedes that classifications such as those at issue here, which neither regulate suspect classes nor burden fundamental rights, must be sustained if they are rationally related to a legitimate governmental interest. *See Price v. Cohen,* 715 F.2d 87, 92, 94 (3d Cir.1983), *cert. denied,* 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 700 (1984); *Jamieson v. Robinson,* 641 F.2d 138, 142 (3d Cir.1981).

■ Empire contends that the federal defendants justified the indemnity regula-

tions by expressing concern about the economic harm to poultry owners whose flocks were destroyed but, at the same time refused reimbursement to other flock owners who were also economically harmed by the regulations. Suggesting that if the intent of the regulations was to provide relief from economic harm they caused, Empire argues, all persons harmed by the regulations should be compensated. Empire further asserts that this is especially true when the owners of the flocks not destroyed are also subject to the same restrictions on movement of their flocks to outside the quarantine area.[5]

The indemnity regulation, we note, does not classify people but rather classifies property—poultry and poultry products destroyed to prevent the spread of avian flu and those that are not. While, of course, this may not be dispositive of the issue, it is also true that *any* owner of poultry destroyed in an effort to prevent the spread of the flu is eligible for indemnity. In fact, Empire received compensation for its flocks that were so destroyed. Further, the indemnity regulation was promulgated to encourage owners of infected or exposed poultry to destroy their birds, thereby reducing the spread of the disease. There was no need to encourage owners of noninfected and nonexposed birds to do likewise. Thus it was rational to indemnify the first group and not the second. Owners of noninfected or nonexposed birds were free to slaughter their birds or sell them to others for slaughter within the quarantined area. Consequently, we conclude, as did the district court, that the classification was rationally related to a legitimate government interest. Empire was not denied equal protection and summary judgment in favor of

all defendants on that claim was appropriate.

## IV.

### Taking Without Compensation

Empire claims that the federal defendants "engaged in regulatory conduct which resulted in a taking" of its property, thereby violating the fifth amendment. While the complaint is somewhat unclear, Empire also appears to assert a taking claim against the state defendants under the fourteenth amendment.[6] The magistrate assumed that Empire suffered some diminution in the value of its poultry, but noted that its property was not invaded, and it still had the ability to put its poultry to another economic use. Consequently, he found no taking. The magistrate relied upon *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), which held that the "loss of future profits—unaccompanied by any physical property restriction—" was insufficient to evidence a taking.

Empire excepted to the Magistrate's Report arguing that reliance upon *Andrus* was misplaced and that *Florida Rock Industries v. United States*, 8 Cl.Ct. 160 (1985), *modified*, 791 F.2d 893 (Fed.Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), instead controls. The district court found that the degree of interference with plaintiff's property did not amount to a taking. Citing *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707 (3d Cir.1985), *aff'd sub nom. Keystone Bituminous Coal Ass'n v. DeBenedictis*, —— U.S. ——, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the district court reasoned that the regulation caused Empire to suffer some losses but did not de-

---

**5.** Empire also raises the following preposterous argument: "The irrationality of the defendants' argument is illustrated by the fact that if no relief is provided to uninfected property owners, those owners would be encouraged to expose their flocks to avian influenza in order to obtain reimbursement." Empire's Brief at 36. Plainly, this argument that the government must in regulating assume cupidity is without merit.

**6.** If the federal defendants accomplished a regulatory taking, the Tucker Act provides a just compensation remedy against the United States. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 125–36, 95 S.Ct. 335, 349–55, 42 L.Ed.2d 320 (1974). Thus the federal defendants' taking could not be without just compensation. It appears, therefore, that the complaint fails to state a *Bivens* claim against the federal defendants upon which relief may be granted. Because a taking claim is asserted against the state defendants, however, we address it.

stroy its property or prevent Empire from making a viable economic use of it.

Since the argument of this appeal the Supreme Court has decided the *Keystone Bituminous* case, affirming the decision on which the district court in the instant case placed principal reliance. In the process the Court restated the rule of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) which recognizes that some governmental regulatory activity may amount to a taking for public use. Justice Stevens first rejected the contention that *Pennsylvania Coal* had overruled the many cases emphasizing that private property was held subject to the state's exercise of the police power. "Under our system of government", he observed, "one of the state's primary ways of preserving the public weal is restricting the uses individuals can make of property." *Keystone Bituminous Coal Ass'n. v. De-Benedictis,* —— U.S. ——, 107 S.Ct. 1232, 1245, 94 L.Ed.2d 472 (1987). Since, unlike the statute considered in *Pennsylvania Coal,* Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act (the Subsidence Act) plainly sought to further the public interest, payment of compensation was not required. *Keystone Bituminous,* 107 S.Ct. at 1245–46.

Justice Stevens observed, further, that "we need not rest our decision on this factor alone, because petitioners have failed to make a showing of diminution of value sufficient to satisfy the test set forth in *Pennsylvania Coal* and our other regulatory takings cases." *Keystone Bituminous,* 107 S.Ct. at 1246. He therefore affirmed the summary judgment in favor of the defendants on Keystone's facial challenge to the Subsidence Act because the test for when compensation must be paid for the diminution of value and investment-backed expectations requires a specific factual inquiry. *See Keystone Bituminous,* 107 S.Ct. at 1246–51. Thus *Keystone Bituminous* makes clear that to prevail on a regulatory taking claim, a claimant must establish both that the governmental action falls outside the traditional police power, and that the governmental action suffi-ciently interferes with investment-based expectations.

■ The first component of the *Keystone Bituminous* analysis is controlling. The opinion of the Court strongly reasserted the authority of cases such as *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) recognizing government police power over property which could, because of disease, cause harm to others. *See Keystone Bituminous,* 107 S.Ct. at 1244–46. The quarantine regulation at issue here falls squarely within that line of cases. Indeed, *Miller v. Schoene* suggests that a government could even require the slaughter of infected poultry without compensation, although in this case it did not do so. *Miller v. Schoene* held that, to prevent harm to orchards, Virginia could require destruction of trees suffering from cedar rust without paying compensation. In *Miller,* the owner was permitted to sell the resulting cut timber but no compensation was required for the trees' value standing, or for the decrease in the market value of the realty caused by the trees' destruction. Here, the regulatory scheme did provide for compensation if chickens were ordered destroyed because they were infected with the flu. Otherwise, only quarantine of the live birds was mandated. The bird owners, thus, had a choice of keeping the poultry alive within the quarantine zone until the ban was lifted, or of killing and processing the birds. The processed birds could be sold in or out of the quarantined area. An owner having no processing facilities in the zone could sell them to someone who could process them. Plainly, while the regulations at issue here limited Empire's use of its property, they did not deprive Empire of all uses or of all value of the property. Such a quarantine cannot be considered a taking. The reaffirmation in *Keystone Bituminous* of the *Miller v. Schoene* rule alone requires affirmance of the judgment from which Empire appeals.

■ Like the Supreme Court in *Keystone Bituminous,* however, we consider, as well, whether on this record Empire has presented any evidence satisfying the sec-

ond requirement, proof of loss of investment-backed expectations. Empire claims that the USDA regulations implemented December 8, 1983 and the state regulations of December 23, 1983 took its property by preventing it from shipping chickens grown in the quarantine zone to its processing plants outside of that zone. The undisputed fact, however, is that Empire placed at least some chickens with a farmer located in the quarantine area after it knew or should have known that those birds could not be shipped out of the zone. All of the poultry at issue were subject to the restriction on intrastate movement prior to Empire's closing on January 17, 1986 of its one processing plant in the zone—Bird-in-Hand. Empire admitted that it knew there were no other kosher processing plants in the quarantine zone. Consequently, when Empire closed its Bird-in-Hand processing plant, it could have had no reasonable investment-backed expectation of kosher processing its chickens in the quarantine zone.

Diminution in value of property such as Empire claims is not sufficient by itself to establish a right of compensation as a result of a public health regulation in the public interest. *See, e.g., Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). Thus, the district court did not err in granting summary judgment in favor of all defendants on the taking without compensation claim.

## V.

### Transfer to the Federal Circuit

■ The federal defendants contend that because the complaint sought damages from the federal fisc as well as from the state defendants and the federal defendants in their individual capacities, the appeal does not lie here. It lies instead, they urge, in the Court of Appeals for the Federal Circuit, because that court has exclusive jurisdiction:

> (2) of an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, in whole or in part, on section

1346 of this title, except that jurisdiction of an appeal in a case brought in a district court under section 1346(a)(1), 1346(b), 1346(e), or 1346(f) of this title or under section 1346(a)(2) when the claim is founded upon an Act of Congress or a regulation of an executive department providing for internal revenue shall be governed by sections 1291, 1292, and 1294 of this title;

28 U.S.C. § 1295(a)(2) (1982). Thus, they urge, the appeal was taken to the wrong court, and should be dismissed in its entirety or transferred to the Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. § 1631 (1982). The quoted jurisdictional provision is a part of the Federal Courts Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 25. As the federal defendants read the statute, if a case involves any Tucker Act damage claim, the entire case must be appealed to the Court of Appeals for the Federal Circuit.

The meaning of section 1295(a)(2) has been a matter of controversy. *See, e.g., Van Drasek v. Lehman,* 762 F.2d 1065 (D.C.Cir.1985) (entire case transferred to Court of Appeals for Federal Circuit although district court's jurisdiction was based primarily on claims other than the Tucker Act); *Professional Managers' Ass'n. v. United States,* 761 F.2d 740 (D.C. Cir.1985) (per curiam) (same). *Compare Hohri v. United States,* 782 F.2d 227 (D.C. Cir.) (regional Circuit Court of Appeals has jurisdiction over appeal when Federal Tort Claims Act claim is joined with Tucker Act claim) (with Markey, C.J., dissenting), *reh'g denied per curiam,* 793 F.2d 304 (with Bork, J., dissenting), *cert. granted,* —— U.S. ——, 107 S.Ct. 454, 93 L.Ed.2d 401 (1986); *Squillacote v. United States,* 747 F.2d 432 (7th Cir.1984) (Section 1295(a) read functionally, rather than literally, in light of statutory purpose), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 302 (1985).

In this case, however, we need not join in the dispute over the meaning of section 1295(a)(2) which has so sharply divided the judges of the Court of Appeals for the

District of Columbia. Empire's complaint arguably may be read as alleging a cause of action against the federal defendants in their official, as well as their individual, capacity and thus a claim for the payment of compensation from the federal treasury. It may not, however, be read as alleging a cause of action over which the district court had jurisdiction based on section 1346(a)(2) because the complaint on its face seeks damages exceeding $10,000. Moreover, Empire did not plead reliance on section 1346(a)(2). The district court did not purport to pass on any Tucker Act claim. In order to reach the jurisdictional issue which the federal defendants so vigorously tender, we would have to redraft the complaint so as to assert a claim which was neither made nor considered by the trial court, and to reject Empire's non-frivolous assertion that its damage claim exceeds $10,000.

This appeal properly came to this court. The motion of the federal defendants to dismiss it or transfer it to the Court of Appeals for the Federal Circuit must therefore be denied.

### VI.

#### Conclusion

We have jurisdiction over Empire's appeal. Summary judgment on its due process, equal protection, and taking claims was properly granted. The judgment appealed from will therefore be affirmed, and the motion to dismiss or transfer the appeal will be denied.

SLOVITER, Circuit Judge, concurring.

I write separately only to point out that the procedure followed in the district court by the plaintiff and by the federal defendants unnecessarily muddled the procedural posture of this case. The complaint did not expressly state that the federal defendants were being sued in their individual capacities. Those defendants were served pursuant to Fed.R.Civ.P. 4(d)(5) and hence were properly in the action in their official capacities. Plaintiff did not serve those defendants individually as it is required to do when suing federal officials in their individ-

ual capacities. Thus, in the ordinary case, I see no reason why those individuals should have been required to file a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) for lack of jurisdiction over the person, nor would that defense have been waived under Rule 12(h)(1) when plaintiff subsequently asserted that suit was against the federal officials both in their individual and official capacities.

In this case, however, the claim against the federal officials in their official capacities was one for money damages in excess of $10,000 and, therefore, properly should have been brought in Claims Court. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Because the U.S. Attorney did not file a motion to dismiss for lack of subject matter jurisdiction but instead moved for summary judgment on the merits, it was not unreasonable for the district court to have believed that the claim was also against the federal officials in their individual capacities.

The U.S. Attorney now argues before us that the district court did not have jurisdiction to hear the claims because the federal defendants were not individually served. The procedural stance taken by the U.S. Attorney on behalf of the federal defendants can reasonably be deemed to have been a waiver of personal service, and hence I agree with Judge Gibbons' conclusion that the district court had jurisdiction to reach the substantive issues on the motion for summary judgment filed by the U.S. Attorney.

This is not the first case before us in which the U.S. Attorney has raised on appeal an alleged lack of subject matter jurisdiction which it did not raise in the district court. While it is true that subject matter jurisdiction is never waived, the U.S. Attorney has an obligation to raise the issue promptly before the trial court which may be put to unnecessary work when such a default is not promptly called to its attention.