JOAN WILSON & others[1] vs. COMMONWEALTH.

No. 90-P-540.

Barnstable. April 18, 1991. - January 9, 1992.

Present: DREBEN, KASS, & GREENBERG, JJ.

Further appellate review granted, 412 Mass. 1102 (1992).

*Practice, Civil*, Judgment on the pleadings. *Massachusetts Tort Claims Act. Governmental Immunity. Commonwealth*, Liability for tort. *Eminent Domain*, What constitutes taking. *Administrative Law*, Exhaustion of remedies. *Wetlands Protection Act. Real Property*, Littoral property. *Beach*.

In a civil action brought against the Commonwealth by owners of ocean-front property in Chatham, the judge correctly dismissed on the pleadings the plaintiffs' negligence counts that sought to recover for loss of the plaintiffs' houses and property in the aftermath of a storm in 1987, where no facts alleged supported claims under such a theory. [763-764]

In a civil action brought against the Commonwealth by owners of ocean-front property in Chatham, the trial judge incorrectly dismissed on the pleadings the plaintiffs' claims, seeking damages for the loss of their houses and property in the aftermath of a 1987 storm, that were based on a theory of a regulatory taking without compensation under the Wetlands Protection Act, where the questions of the plaintiffs' exhaustion of remedies and the viability of the claims required further development of the record. [764-767]

CIVIL ACTION commenced in the Superior Court Department on July 31, 1989.

The case was heard by *James J. Nixon, J.*, on a motion to dismiss.

*Nicholas B. Soutter* (*Paul McGovern* with him) for the plaintiffs.

*Madelyn Morris*, Assistant Attorney General, for the Commonwealth.

GREENBERG, J. Owners of oceanfront property in Chatham sued the Commonwealth under negligence and regulatory

---

[1] Ronald Wilson, Stephen Rolfe, Frederick Rolfe, and Elaine Rolfe.

taking theories to recover for the loss of their homes in the aftermath of a violent storm in 1987. The damage occurred when the ocean washed away the owners' beaches and ultimately undermined the foundations of their houses. In a confused complaint, the plaintiffs articulate a number of theories under which the Commonwealth should be held responsible for the damage to their property.[2] The trial judge dismissed the complaint under .Mass.R.Civ.P. 12(c), 365 Mass. 756 (1974). We affirm on all counts except the taking claim; as to the taking claim, we reverse and remand for proceedings consistent with this opinion.

1. *Facts and procedural history.* Our narrative begins in January, 1987, when a major winter storm washed away a section of Nauset Beach, a sandy barrier off the coast of Chatham. The resulting breach, over a mile wide, exposed the previously protected shoreline along Chatham Harbor to the ocean's full force. It soon became clear that the gap in the sandbar spelled catastrophe for certain property owners whose lots lay at the edge of the water. The formerly stable harbor beach began to erode at an alarming rate, reclaiming sand from the beachfront and bringing the ocean ever closer to the houses which bordered the coast.

A group of those coastal property owners consulted with an engineering firm in developing a plan to prevent further erosion of their property. They petitioned the Chatham conservation commission (commission) in October, 1987, under the Wetlands Protection Act, G. L. c. 131, § 40, for permission to build a "stone revetment," a kind of sea wall, to protect their homes. After a hearing in November, the commission denied the owners' request but allowed them to

---

[2]The complaint arguably fails to comply with the requirements of Mass.R.Civ.P. 8, 365 Mass. 749-750 (1974), that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Mass.R.Civ.P. 8(a)(1), and that each averment in the pleading be "simple, concise, and direct." Mass.R.Civ.P. 8(e)(1). Some counts of the complaint are internally inconsistent (e.g., those claims transposing "intentional and malicious" behavior and "negligence") or conflate multiple causes of action. This issue, however, was not raised by the Commonwealth. Accordingly, we shall construe the complaint as to do substantial justice. Mass.R.Civ.P. 8(f), 365 Mass. 751 (1974).

construct a temporary beach barrier using sand-filled plastic tubes.

In December, 1987, the owners filed an action in the Superior Court seeking to enjoin the commission, the Department of Environmental Quality Engineering (DEQE),[3] and the Army Corps of Engineers from interfering with their construction of stone revetments. The court issued a temporary restraining order on December 21, 1987, followed, after a full hearing, by a ninety-day interlocutory order on January 4, 1988. The orders provided relief to a majority of owners by allowing them to retain large stones which they had already placed on the beach pending evaluation of an application to the DEQE, pursuant to G. L. c. 91A, for a license to build a permanent structure to protect their properties.[4] However, the remaining owners, including those involved in the present case, were ordered to remove the stones from their land within forty days and to replace them, if they chose, with the sand tubes mentioned earlier.

The court's differential treatment of the owners resulted from the regulatory classification of their various properties. The Wetlands Protection Act protects various types of shorelands, including "coastal dunes," 310 Code Mass. Regs. § 10.28 (1987), and "coastal banks," 310 Code Mass. Regs. § 10.30 (1987). Each of these formations is presumed to be "significant to storm damage prevention and flood control." 310 Code Mass. Regs. §§ 10.28(1), 10.30(1).[5] While this presumption may be rebutted, any "dredging, filling, removing or alteration" of such land (such as the construction of stone revetments) is not permitted if it interferes with the

---

[3]The DEQE is now known as the Department of Environmental Protection.

[4]Apparently, some owners had resorted to self-help in constructing a revetment prior to the commission's action.

[5]Coastal bank controls flooding by protecting against wave action and by nourishing the beach as it gradually erodes. 310 Code Mass. Regs. § 10.30(1). Coastal dunes serve the same functions but in a more dynamic way, shifting with changes in shoreline shape, wind, and wave action. Dunes also serve as nesting grounds for birds. 310 Code Mass. Regs. § 10.28(1).

ability of the land structures to perform their flood control functions. *Ibid.*

The regulations draw a key distinction between the two forms of wetlands. While the prohibition against building coastal dune revetments is absolute, see 310 Code Mass. Regs. § 10.28(4), it does not apply to coastal banks, which are exempted because of their height and stability. Revetments may be raised on this type of land if they are built to protect buildings constructed prior to August 10, 1978, if they are absolutely necessary, and if they minimize any adverse environmental impact. 310 Code Mass. Regs. § 10.30(3). Among the properties at issue, the DEQE found the majority to be coastal bank, and thus eligible for protection so long as they supported buildings erected before 1978. Those lots belonging to the owners who brought the present case were found to rest on coastal dunes, and thus further construction was absolutely prohibited.[6] Based on this DEQE determination, the motion judge, in finding it "unlikely that the property owners in the designated 'coastal dune' area would be able to prevail with the placement of a stone revetment," denied them injunctive relief. In its answer, the Commonwealth included a counterclaim for violation of the Wetlands Protection Act.[7]

Despite this initial defeat, the owners forged ahead with attempts to obtain permission to build the revetment and, in January, 1988, again petitioned the commission. In an "Order of Conditions" dated February 2, 1988, the commission now acquiesced, holding that those properties previously designated as coastal dune were "so wasted by the shock of the Nauset Beach break that they are simply unable now to perform the [flood control] functions described in the [Wetlands Protection Act] Regulations." For regulatory purposes, the commission would now classify the entire affected area as coastal bank and sanction the revetment.

---

[6]Two other property owners not before us were also deemed coastal dunes settlers.

[7]The Commonwealth's counterclaim alleged that the owners had already violated the Act by placing a two-ton boulder on their land.

The owners' victory, as it turned out, was short-lived. Two weeks later, on February 17, 1988, the DEQE appealed the commission's decision on its own initiative in accordance with G. L. c. 131, § 40,[8] which effectively vacated the order pending the DEQE's own review. The DEQE reversed the commission's order on March 4, 1988, and decided that the owners could not build a sea wall. The DEQE found that the owners' land was coastal dune and reasoned that the dune structures continued to serve a function in both storm damage prevention and flood control.[9] One week later, the owners requested an adjudicatory hearing to review the determination of the status of their land as coastal dune, and on April 26, 1988, amended this "appeal" to a hearing officer to include a request for a variance. See 310 Code Mass. Regs. § 10.36 (1987).

Apparently lacking faith in their administrative prospects, the owners continued to prosecute their cause in court. Just prior to issuance of the commission's order of conditions, on February 1, 1988, the owners filed a second suit in the Superior Court in which they alleged that the Commonwealth, in blocking the construction of a revetment, had made a regulatory taking by permitting the sea to encroach upon their land.[10] The second suit was dismissed on May 25, 1988, under Mass.R.Civ.P. 12(b)(9), 365 Mass. 755 (1974), on the ground that there existed a prior pending action.

The owners' initial suit had, however, stalled pending the outcome of the administrative process. On February 26, 1988, the parties had entered into a stipulation pursuant to which the owners agreed to abide by the final order of the DEQE with respect to preventative measures on their lots.

---

[8]This is an internal "appeal." The statute provides that if the Commissioner of Environmental Protection is aggrieved by the action of a conservation commission, the commissioner may request a determination from the commissioner's own agency that the local conservation commission's order be superseded.

[9]The DEQE advised the owners that they could still petition for emergency certification, see 310 Code Mass. Regs. § 10.06 (1987), to use nonpermanent structures (such as sand-filled tubes) to secure their property.

[10]Other counts in the owners' second complaint included negligence, nuisance, and unreasonable use of littoral property.

The owners focused again on the administrative process. On June 14, 1988, the owners and the DEQE set the ground rules for future proceedings in a prehearing conference. The parties agreed to submit to the hearing officer prefiled testimony. See 310 Code Mass. Regs. § 1.01(8)(f) (1986). The owners' testimony was due on August 1, 1988; that of the DEQE was due three weeks later. The parties were also to attempt voluntary discovery, and the owners agreed to file an "environmental notification form" pursuant to the Massachusetts Environmental Policy Act, G. L. c. 30, §§ 61-62H (MEPA).[11]

The weeks passed without the owners having filed any testimony. On August 8, 1988, seven days beyond the deadline, the DEQE filed a motion to dismiss for failure to prosecute, failure to conduct voluntary discovery, and failure to file the environmental notification form. In response, the owners attributed their delay to a lack of funds. Announcing that they could now proceed, the owners submitted the overdue testimony. The hearing officer denied the motion to dismiss, but suspended proceedings in the case "pending completion of the MEPA process."

On September 1, 1988, the owners filed an environmental notification form and requested by motion that the DEQE consider their petitions pending the outcome of the MEPA evaluation. Also, in mid-October despite the hearing officer's stay of proceedings, the owners filed a motion to dismiss or to compel discovery in the DEQE proceeding. No action was taken on either of these motions.

The ocean overran the plaintiffs' homes on October 22, 1988. On October 27, the Secretary of Environmental Affairs issued a MEPA certificate for the owners' proposal which required them to obtain an environmental impact report for the project. In January, 1989, the plaintiffs volunta-

---

[11]General Laws c. 30, §§ 61-62H, require that any person applying to an agency for a project permit must first inform the Secretary of Environmental Affairs by way of an environmental notification form. If the Secretary determines that the project is likely to damage the environment, the proponent of the project must file an "environmental impact report" with the Secretary. 301 Code Mass. Regs. §§ 11.00 et seq. (1987).

rily dismissed their DEQE petition and on July 31, 1989, filed this lawsuit, their third action against the Commonwealth.

2. *The judgment on the pleadings.* The judge dismissed the plaintiffs' claims on the pleadings. See Mass.R.Civ.P. 12(c). We must determine whether, taking all of the plaintiffs' factual allegations as true, they are legally sufficient to make out a claim. *Minaya* v. *Massachusetts Credit Union Share Ins. Corp.*, 392 Mass. 904, 905 (1984). The effect of a motion for judgment on the pleadings is to challenge the legal sufficiency of the complaint. *Burlington* v. *District Attorney for the N. Dist.*, 381 Mass. 717, 717-718 (1980). See also *Liberty Mut. Ins. Co.* v. *United States*, 490 F. Supp. 328, 329 n.1 (E.D.N.Y. 1980) ("On a 12[c] motion, the movant is deemed to admit his adversary's allegations of fact; the movant's allegations, conversely, are taken as true only if specifically admitted by the adversary").

a. *The negligence counts.* The complaint includes three counts based on negligence: (1) that the Commonwealth "willfully and maliciously ignored scientific fact in implementing and enforcing the [wetlands] regulations"; (2) that the Commonwealth failed to "apply regulations in a scientific or rational manner"; and (3) that the Commonwealth, through its "willful and malicious" conduct, caused the delays in the processing of the owners' DEQE petition which ultimately resulted in the demolition of the plaintiffs' houses.

The counts were properly dismissed. To the extent that the DEQE's actions may be construed as "willful and malicious," the Commonwealth is immune from liability from any such intentional acts of its employees. G. L. c. 258, § 10(c). *Tilton* v. *Franklin*, 24 Mass. App. Ct. 110, 112 (1987). If the challenged acts were not wilful, but negligent, they are no more actionable, for the discretionary acts of public officials are also immune. G. L. c. 258, § 10(b). *J.K.* v. *Commonwealth*, 28 Mass. App. Ct. 761, 764 (1990). It is well established that "[t]he decision to adopt and implement [a] policy is precisely the kind of discretionary function which G. L. c. 258, § 10(b), was designed to protect." *Pa-*

*trazza* v. *Commonwealth*, 398 Mass. 464, 469-470 (1986). This is so even if the adopted policy is not prudent or reasonable. *Id.* at 470 n.3. Such discretionary acts include the making of scientific determinations, *Wells* v. *United States*, 851 F.2d 1471, 1476-1477 (D.C. Cir. 1988), cert. denied, 488 U.S. 1029 (1989), and the issuance of certificates. See *United States* v. *Varig Airlines*, 467 U.S. 797, 814-820 (1984). There are no facts alleged here by the plaintiffs ·which would make out a negligence claim against the Commonwealth.

b. *The regulatory taking theory.* The complaint's remaining counts allege that the DEQE's action in denying the plaintiffs the opportunity to build a stone revetment on their beaches rendered their land valueless and was tantamount to a "taking" of their private property for public use without just compensation, contrary to their rights under the Fifth and Fourteenth Amendments to the United States Constitution.

A taking implicating the just compensation clause may occur in several ways. The classic case arises when a governmental body, by virtue of its eminent domain power, transfers title from a private property owner to itself. See *Danforth* v. *United States*, 308 U.S. 271 (1939). A taking also occurs if government action results in the permanent occupation of or trespass on the owner's land. G. L. c. 79, § 10. See also *Nollan* v. *California Coastal Commn.*, 483 U.S. 825, 831 (1987); *Fragopoulos* v. *Rent Control Bd. of Cambridge*, 408 Mass. 302, 309 (1990).

In the absence of a physical invasion, however, a taking may still occur if the State regulates property in such a way that it "does not substantially advance legitimate state interests,[12] or denies an owner economically viable use of his

---

[12]The proper standard for examining land-use regulations is that the regulation must "substantially advance" a "legitimate state interest," as opposed to the traditional equal protection and due process standard that the State only show a rational relationship between the adopted measure and its objective. See *Nollan* v. *California Coastal Commn.*, 483 U.S. at 834 n.3. Despite this language, the plaintiffs would be required to overcome the heavy presumption in favor of regulations protecting the public

land" (citations omitted). *Agins* v. *Tiburon*, 447 U.S. 255, 260 (1980). While the historic remedy for a regulatory scheme that "goes too far," see *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 415 (1922) (Holmes, J.), was prospective invalidation of the regulations effecting the taking, more recent cases hold that a landowner may also be entitled to monetary compensation for losses caused by excessive regulation. *First Evangelical Lutheran Church* v. *Los Angeles County*, 482 U.S. 304 (1987). Contrast *Lucas* v. *South Carolina Coastal Council*, 404 S.E.2d 895 (S.C.), cert. granted, 112 S. Ct. 436 (1991) (prohibition through statutorily mandated setback lines of construction of any permanent structure [including a dwelling] does not effect a regulatory taking of private property without just compensation because the law prevents uses seriously harming the general public). Whether a particular governmental action amounts to a taking requires an examination of the character of the governmental action as well as the nature and extent of the governmental interference with the owners' rights in the property as a whole. See *Nassr* v. *Commonwealth*, 394 Mass. 767, 770 (1985).

Count V of the complaint alleges that the Commonwealth's application of the Wetlands Protection Act "resulted in the total destruction of plaintiffs' properties" and, in conjunction with Count VI, prays for "damages including but not limited to . . . two houses and property." Ordinarily, we require that litigants alleging a regulatory taking exhaust all available administrative remedies before seeking relief in court.[13] See *Williamson County Regional Planning*

---

health and safety, independent of their impact on the use of the plaintiffs' property. *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U.S. 470, 489-493 (1987). See also note 16, *infra*.

[13]We rehearse the record as it applies to this issue. The decision of the DEQE to prohibit a stone revetment might have been appealed through an adjudicatory hearing. 310 Code Mass. Regs. § 10.05(7)(j) (1987). The plaintiffs started down this road but abandoned it after their houses were destroyed. In addition, the plaintiffs admit that they never complied with the MEPA process by submitting a report on the environmental impact of the proposed revetments on the adjacent shoreline. Without the environmental impact report, the DEQE would not be able to grant the requested

*Commn.* v. *Hamilton Bank,* 473 U.S. 172, 186-194 (1985); *Culebras Enterprises Corp.* v. *Rivera Rios,* 813 F.2d 506, 515 (1st Cir. 1987); *Hamilton* v. *Conservation Commn. of Orleans,* 12 Mass. App. Ct. 359, 372-374 (1981). This threshold requirement developed because the absence of a final agency decision renders it practically impossible for a court to evaluate "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." *Williamson,* 473 U.S. at 191.

There are, however, recognized instances where exhaustion may not be appropriate. The plaintiffs may escape this requirement if their case falls within the "narrow 'futility exception' to the final decision requirement for takings claims." *Gilbert* v. *Cambridge,* 932 F.2d 51, 60-63 (1st Cir.), cert. denied, 112 S.Ct. 192 (1991). The posture of this case — an appeal from a rule 12(c) dismissal — requires that the plaintiffs' claim that their land has been rendered valueless be accepted as true.[14] There is also presented, in their complaint, a broader claim that the regulatory restriction imposed on their "dune area" properties was so extensive as to deny them due process. The plaintiffs are no longer seeking permission to build a seawall or to exercise any other rights connected with the property subject to administrative review. Therefore, the Commonwealth's contention that plaintiffs must exhaust all available administrative remedies before the

---

relief. 310 Code Mass. Regs. § 10.07 (1987). Finally, the plaintiffs suspended their early efforts to obtain a variance to the DEQE regulation, 310 Code Mass. Regs. § 10.36, an option specifically designed to avoid takings claims. The case of *Hamilton* v. *Conservation Commn. of Orleans,* 12 Mass. App. Ct. 359, 372-374 (1981), cited by the plaintiffs, is inapposite. In that case, the DEQE issued a final order denying a building permit to the plaintiff. The court held that there was no need to appeal that order under G. L. c. 30A, § 14, before commencing a taking action in court. That scenario is quite distinct from the present case, where the plaintiffs voluntarily terminated the administrative process and deprived the agency of the opportunity to ameliorate damages before proceeding to court.

[14]If the allegation of "total destruction" should prove unfounded, the inquiry becomes whether the "circumstances have so changed that the [property] ceases to be economically viable." *Penn Central Transp. Co.* v. *New York,* 438 U.S. 104, 138 n.36 (1978).

case proceeds to trial is not apt. When exhaustion is not stat-utorily mandated, the decision to require it in a given case is a matter of sound judicial discretion. *Facchiano* v. *United States Dept. of Labor*, 859 F.2d 1163, 1167 (3d Cir. 1988), cert. denied, 490 U.S. 1097 (1989). Consequently, both the exhaustion question and the viability of the taking claim hinge on the specific facts as they may emerge at trial. Only a more fully developed record will enable the trial judge or a reviewing court to decide whether the DEQE's denial of the plaintiffs' request to build a stone revetment on their own property constitutes a regulatory taking.[15] The trial judge prematurely dismissed this count.

Because of the complexity of this issue, we briefly com-ment on a few areas which may be relevant on remand. First, the trial judge could decide that the Commonwealth's police powers insulate it from liability in this case.[16] The trial judge, moreover, may also consider whether delay on either party's behalf was sufficient to be deemed the "cause" of the eventual disaster. No compensable taking is caused by "fluc-tuations in value during the process of governmental deci-sionmaking, absent extraordinary delay." *First Evangelical Lutheran Church*, 482 U.S. at 320, quoting from *Agins* v.

---

[15]If the judge finds that the revetment was to be built on the Common-wealth's property, we do not hesitate to note that such a situation could never describe a compensable taking.

[16]The primary purpose of the regulations is to prevent flooding and storm damage caused by the destruction of natural land formations which perform that function. 310 Code Mass. Regs. §§ 10.28(1), 10.30(1). These regulations essentially prevent the creation of a nuisance by prop-erty owners who would prevent the natural disposition of sand along the beachfront. *Lummis* v. *Lilly*, 385 Mass. 41 (1982). Cf. *Miller* v. *Schoene*, 276 U.S. 272 (1928). In the *First Evangelical Lutheran Church* case, 447 U.S. at 313, the Court left open the question whether "the [defendant] might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations." See, e.g., *Mugler* v. *Kansas*, 123 U.S. 623 (1887); *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915); *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962). See also *Empire Kosher Poultry, Inc.* v. *Hallowell*, 816 F.2d 907, 915 (3d Cir. 1987) ("to prevail on a regula-tory taking claim, a claimant must establish both that the governmental action falls outside the traditional police power, and that the governmental action sufficiently interferes with investment-based expectations").

*Tiburon*, 447 U.S. at 263 n.9. We do not know on this record whether the government extraordinarily delayed resolution of the plaintiffs' permit requests. Reciprocally, a finding of unreasonable delay on the plaintiffs' part in pursuing proper administrative relief prior to the October, 1988, storm would bar the taking claim.[17]

Additionally, the facts as developed at trial might establish that the coastal areas in question are impressed with a public trust. See Lahey, Waterfront Development and the Public Trust Doctrine, 70 Mass. L. Rev. 55 (1985). If so, the plaintiffs, from the outset, have had only qualified rights to their shoreland and have no reasonable investment-backed expectations under which to mount a taking challenge. See generally *Boston Waterfront Dev. Corp.* v. *Commonwealth,* 378 Mass. 629, 631-650, 654 (1979); *Opinions of the Justices,* 383 Mass. 895, 901-906, 917-920 (1981). See also Coastal States Organization, Putting the Public Trust Doctrine to Work, at 224-262, 285-291 (1990).

The judgment on the taking claim is reversed, and the case is remanded for further proceedings consistent with this opinion. All other aspects of the judgment are affirmed.

*So ordered.*

---

[17]Other relevant factual inquiries may be whether the revetment could have been built on time to prevent the flooding and whether the revetment would have been effective in preventing the eventual loss of plaintiffs' properties. The plaintiffs have the burden of proof on these issues.